And we'll turn to the last case on our calendar, Vera v. Banco Bilbao Vizcaya. May I proceed, Your Honor? Please. Good morning. Kenneth Caruso. May it please the Court, I represent the appellant, the Spanish bank known as BBVA. This appeal actually presents four cases in one. Haussler, Vidaldo Sr., Vidaldo Jr. with respect to pre-1982 conduct, which is when Cuba was designated as a state sponsor of terrorism. And the fourth case is Vidaldo Jr. with respect to post-1982 conduct. The first three cases are indistinguishable from Vera, which this Court decided ten months ago, and which held that the judgment was void for lack of subject matter jurisdiction under the FSIA. Like Vera, the first three cases involve pre-designation, extrajudicial killings or torture. Like Vera, there is no evidence that specifically links Cuba's designation to any of those activities. Judgment's granting full . . . Mr. Caruso? Yes, Your Honor. Help me with this. I'm sure you will. I'll try. I want to go through the basics, a bit of a timeline. What's the state of play in this case of the district court? Let's just begin with that. Well, my position is that there's nothing further for the district judge to do, yet he refused my application to enter a final judgment. And should we, in your view, as part of our decree here, direct the district court to enter a final judgment? Yes, I believe so, because this case was brought against 16 banks. All right. No, no. Enough. We're going to have to go through a long McGill on it. These are very complicated matters. I want to go through a series of questions. Oh, I'm sorry. Yes, sir. So bear with me. Of course. If the district court's turnover orders weren't final, which is your view, what's the procedural posture of this case? I have filed an appeal under 1291 and the Four Gay Comrade Doctrine from the turnover order, which is not a final order. So you think we have appellate jurisdiction? Indeed, under that doctrine. But you have not requested that the district court issue a final judgment? Oh, I have, and my application was denied. I see. Now, next, how many accounts do you have that pertain to this litigation? My client has one account in New York which was eligible for turnover, and that's the account that was, in fact, turned over under the order on appeal here. There are six others, though, aren't there? Yes, but those don't qualify for turnover. They're so-called phase two accounts. So there's not going to be an adjudication with respect to those. Now, you've been asked to transfer the funds from the account in question to the judgment holders? We've been asked to transfer the funds first to the registry of the U.S. courts, where they sat for two years, and then the most recent turnover order directs the registry to disperse the funds to the plaintiffs, and that has occurred. That has occurred. Indeed. How many interlocutory appeals have you filed over the course of the last three years regarding this particular account? This is the second. The first one was dismissed for lack of a collateral order. I did not argue the Forgay-Conrad Doctrine because I had security and, therefore, had no irreparable injury. Now I lack security, that having been stripped of me by Judge Hellerstein, and, therefore, Forgay-Conrad applies. All right. Tell me, what do you want from us here? What is the decree that you think this court ought to enter? The court should enter a decree reversing and vacating the turnover order because the judgments— Pull the money back to the registry. Well, the second part of the order would be a restitution. The court should hold what it held in VERA, namely that the judgments granting full faith and credit to the Florida State Court judgments are void. The federal full faith and credit judgments are void for lack of subject matter jurisdiction under the FSIA. That's what VERA held, and what I'm calling the first three cases here are indistinguishable from that. So I want an order reversing and vacating the turnover order, a judging that the judgments granting full faith and credit are void for lack of subject matter jurisdiction, and an order of restitution. Why don't you wait for all of that until we have appeals from orders from final judgment? Well, because— Why are you asking us to reach that, it seems to me, prematurely? Well, Judge Hellerstein has created an untenable situation by refusing to enter a final judgment even though he has nothing left to do. No one on the plaintiff's side has ever articulated what else remains for the district judge to do. Neither has Judge Hellerstein, yet he has refused to enter a final judgment. Well, that's why I'm wondering—I'm a little puzzled about what would be a final judgment here in this case, and why you are—and maybe this is technically correct, but you're taking the position, I take it, that this is not a—you aren't requesting that Judge Hellerstein enter a separate final judgment as to you, or were you? That's what you're asking for. Okay. And he declined to do that. Correct. And what would be a final judgment technically, an undisputable final judgment, would be after all 15 banks have had their claims addressed? The other 15 banks have had their claims adjudicated. I see. Those banks—the 15 banks have turned over everything that they—was eligible for turnover, and then the plaintiffs and those 15 banks entered a Rule 41 stipulation of dismissal of all other claims, which Judge Hellerstein so ordered. So you're not asking Judge Hellerstein—or maybe you did, but you might be able to ask Judge Hellerstein not just to enter a separate final judgment as to you. You're saying he should have entered a final judgment as to everybody because there's nothing left in the case. Precisely, and that's what I asked for. De facto, it is a final judgment. That's what I asked for. Okay. I mean, you can treat this as de facto final judgment. Well, that's one way. That is possible. The other possibility is the Jacobson remand and require Judge Hellerstein to articulate just what it is he thinks he still has to do because he's never articulated that, and neither have my adversaries. So— The earlier VERA panel, VERA 2, we can call it, warned that if it permitted the appeal of a turnover order, quote, every turnover order would be subject to immediate appeal. Do you remember that? I do. And isn't that what would happen here? No, because in that case, I had security. In this case, I don't. That makes the Forgay-Conrad Doctrine applicable. The injury becomes—or is treated as irreparable when the payor has no security for restitution and would have to bring an uncertain litigation to recoup that. So the original turnover order directed the turnover to the court. Correct. So the money was still sitting there, not in the possession of the plaintiffs, until such time as further events took place. That's right. So at that point, you're saying there was no irreparable injury and no finality because the turnover had been to the court, but things changed when the turnover was made to the plaintiffs. Precisely. Right. Now, of course, hasn't the irreparable injury already happened? I mean, they've got it. They could have long since squandered it. If it comes under the heading, I'm doing the best I can. I understand. I mean, you know, I'm trying to get reversal. And if you get it now and get an order of restitution, I guess your argument is, assuming that these folks are operating in good faith, and they have no reason to think they aren't, they're not busy squirreling away these assets somewhere to hide them from the court. But over time, any person is likely to spend money that they've been given by a court. And so the longer we wait, the more irreparable the injury becomes. Yes. The delay. The greater the risk. The delay exacerbates my risk, and, you know, that's why I'm here. So my understanding of Forgay-Conrad, though, that its primary use has been for the delivery of physical property and not of cash, with an exception possibly in the SEC and credit bank court case in which we directed or there was an order directing distribution of cash and securities. But in that case, there was also a preliminary injunction that was at issue, so there was an alternative basis for jurisdiction. Why does Forgay-Conrad reach here where cash is at issue? There is language in the decisions in this Court only that says cash turnovers don't qualify for Forgay-Conrad. Every other circuit is to the contrary. You look at the cases I cited from the Seventh, Ninth, and Eleventh Circuits, they don't have an exception for cash. And I think that this Court, although it once said cash doesn't qualify for Forgay-Conrad, hasn't really held that. And Your Honor cited the case, SEC versus the credit bank court. That case involved a turnover of cash and government securities, which are cash equivalents. We also reiterated that, I think, in Olin's in 2013, quoting Sinarama, the original thing. Yes. It's physical property that's at issue. The language is out there, but the holdings are out there, too. And I would say to suggest to you the rationale for Forgay-Conrad, which is the irreparable injury that Judge Lynch was mentioning, applies to cash turnovers just as much as it applies to turnover of real estate or tangible chattels. You know, the rationale, there's no rationale for excluding cash. And I don't quite know what the Court was thinking in 1973 when it said that in the Sinarama case. Well, maybe what it was thinking was what the Sixth Circuit has said, which is that the transfer of money is unlikely to create irreparable harm, for money can usually be returned if improvidently given. That is the thing. Okay. Thank you for citing a case that I didn't find. It's the Jalapeno property management. I'll go back and read it. But, again, the Seventh Circuit, the Ninth Circuit, and the Eleventh Circuit all apply it to cash. And I just don't see a rationale. Yes, okay, so money can be recouped in another litigation, but the uncertainty of that other litigation is what makes the injury irreparable, in quotes. It says it's unlikely to create irreparable injury, not that it never can. Yes, okay, well, fair enough, because I think it does here, and the passage of time, as I said a few minutes ago, exacerbates that. Did Your Honors want to hear anything further on the merits? You're going to have some time. Okay. On rebuttal, but you can, and you've had some extra time now. We've been delighted to hear from you. You have three more minutes later. Sorry, you want me to wait? Yes, yes. One moment. Good morning. May it please the Court. My name is Jim Perkins. I'm here on behalf of the petitioner, Apelli Haussler. I'm going to share my time with Mr. Hall, who represents the Valildos. I do want to, as you're focusing on appellate jurisdiction, there is no appellate jurisdiction here for the reasons stated in VERA 2, and that is this is an execution proceeding, that a turnover is the natural result and ending of a turnover execution proceeding. There is a turnover order, but there is no judgment yet entered. And what the Court said was, what that panel said, was that there is no irreparable harm in the turnover of money. Wasn't in that case, weren't we still at what Mr. Caruso has referred to as Phase I, where the turnover order was a turnover to the Court? It was a turnover to the Court, but I would . . . Well, isn't that a little different than actually releasing the money to the plaintiffs? What else is left for the entry of a judgment? Usually you enter a judgment that says, hey, you, pay him money, right? Here the Court said, hey, you, not only pay him money, pay the money to the Court. And then once it's in the Court, the Court said, okay, now we're going to pay it to the other side. And now the money is gone. So usually the judgment precedes the actual execution. Here the execution preceded the judgment, it seems to me. So what's left to make this non-final? What is left is that VERA II, notwithstanding the fact that Judge Hellerstein's motion to dismiss subject matter jurisdiction opinions were not up on appeal, they're still down in the district court, the VERA III panel concluded that he had not made findings with respect to subject matter jurisdiction and remanded. There is a remand order which ironically addresses one of the issues that BBVA appealed on an interlocutory basis, and that is whether or not that opinion is binding on the other judgment creditors. The remand order provides that it was only binding on VERA, and we submit also that the VERA III opinion specifically says it as well. So that issue . . . That's fine, but then doesn't that go to the question of what relief you might be . . . he might be entitled to if the issue is the district court needs to make proper findings, has to reevaluate subject matter jurisdiction rather than just assuming subject matter jurisdiction exists based on what some other court had said, right? Right. Why wouldn't that be the appropriate order? You're saying Mr. Crusoe is asking for too much to the extent on the merits that he asks us to invalidate these judgments. That's correct. But that still would leave open a remand to tell the judge, wait, before you . . . you have to get the money back, put it back in the court until you have evaluated subject matter jurisdiction, and then you might decide one thing, you might decide another thing. When he gets to that point, there would be an appeal. I suppose that could all be requested. That hasn't been requested yet. But I do know that there is a remand order and there are further proceedings. But my problem is if there are further proceedings contemplated, I get that, that might make this not final in a certain sense. But the money has already flown the coop. The money is now in your possession, right? Your clients are entitled to spend it, do what they want with it. That's right. And I would submit that that makes it even less of an appropriate interlocutory appeal because, as was stated before, there's no longer irreparable harm. Or a possibility of irreparable harm. There has been irreparable harm. The money is out the door. There's nothing to prevent. In other words, the Forgay-Conrad doctrine . . . On the assumption that your client is not busily hiding this in some foreign jurisdiction beyond the reach of the court or doing anything nasty like that, assuming that your client is operating in good faith and is just saying this is my money, I can spend it if I want under the court's order, isn't there still a question of whether that should be returned to the court? I mean, after all, what you're saying is a judge could direct that money be paid by a defendant to a plaintiff, not enter a judgment, and then the party whose money has been taken by the court and given to the plaintiff has no appellate recourse. By the way, it's not BBVA's money. They're a stakeholder. Okay, fair enough. So what? I mean, how does that matter? They're still potentially liable to the person for whom they're a stakeholder, and legitimately are they not entitled to defend their possessory interest in this money? I think you've just articulated another reason why this interlocutory appeal is inappropriate. He can make that application to the district court if that's what he wants to do as a result of VERA 3. It's not the role of this court to do it. I think VERA 2 was very clear that under this fact pattern, by the way, this is still the turnover order that was at issue there. Yes, there was a payment into the registry that was issued at the time, but the holding of that panel is that a turnover order, without respect to where the money goes, is not the final ending of a judgment enforcement proceeding. It is the entry of final judgment. Citing the Argentina case for that, it's pretty clear about that. Let's take it from the beginning, then, on this question of Judge Hellerstein's not having entered a final judgment. Would you agree with Mr. Caruso that he ought to enter a final judgment? I would agree with Mr. Caruso that when the case is remanded, that he ought to enter a final judgment, yes. And you would join Mr. Caruso in such a motion? Depending on what's left, absolutely. If there's nothing left, we would join in such an application. By the way . . . What's left at this moment, I think, is part of the question. There is a remand order with an instruction from the panel of VERA 3 that Judge Hellerstein, we don't see findings of fact and conclusions of law. About VERA. About VERA, but with respect to the overall turnover. What about with respect to Haussler and Villoldo? Are there pending motions to consolidate, or are there motions to apply VERA 3's subject matter jurisdiction holding to the other cases? That was raised here. The premise is that, and this has been the premise of BBVA in every court, that subject matter jurisdiction has been litigated against Haussler. In the Southern District of Florida, in the district court in Haussler, in this court in Haussler, that the court has to sua sponte, establish and determine itself that it has subject matter jurisdiction. This issue, and by the way, when it goes back to the district court, which we believe it should, this issue is really barred by res judicata with respect to Haussler. They have an adverse ruling in the Southern District of Florida that BBVA has no standing to challenge it because the Southern District of Florida judgment was registered in the Southern District of New York. We also submit, as you know from the briefing, that the Haussler decision also exercised subject matter jurisdiction, and they're barred, based on that ruling, from raising it here. We say there were four times that it happened. Again, this is a raising of this issue in the Second Circuit as opposed to taking Judge Hellerstein's judgment or his decision and order on the motion to dismiss on subject matter jurisdiction and bringing it before this court. Those orders are still below, as the VERA 2 panel pointed out. Is it a final order? Is it appealable? It doesn't have to be a judgment. It can be an order. We do review orders. Those two orders were, in fact, appealable, as the VERA 2 panel pointed out. Ironically, those subject matter jurisdiction rulings could have been brought up on an interlocutory basis, but they determined not to do that, and so right now there's really no appealable order. Let me ask you to step back a moment, and Mr. Caruso will have an opportunity. I'll give him some extra time to address this. There is about this case a kind of . . . it's like a guacamole thing. It goes on forever. How long is . . . can you just step back and describe, not only describe the history of litigation, but describe to us, in effect, what you think is going on here, and why is this back to us for the 800th time? Frankly, I think the fact that a stakeholder that is just holding someone else's money is challenging subject matter jurisdiction all over the United States of America, to me, is inexplicable. How much money is involved? In this particular turnover, it's about $550,000. This $550,000 prize has been the subject of how many appeals or how many attempts to . . . Well, there have been four interlocutory appeals here, two of which we have not been party to. One occurred on discovery before we ever intervened in this case, and the third one was on the Vera judgment. We were not party to that appeal either. So there are four in this case. There are four. And that offhand, without making any statement on the merits of all of this, seems to me to be odd, unusual. And maybe you have a view on this or can explain what's going on here. I think it's odd and unusual. There is a long history in Haussler. Haussler has . . . and frankly, with the Cuban terrorism judgments, there's a long history. The Haussler litigation has been going on since 2007 or 2008 in Florida, starting in state court. It was removed to the Southern District of Florida, those writs. Those writs were transferred by consent but under court order to the Southern District of New York, the state court judgment. Separately, there was a full faith and credit determination by the Southern District of Florida. Federalizing the state court judgment. That judgment was registered in New York. And by the way, the Haussler decision lays this out very correctly. Those two proceedings, the state court transfer and the federal judgment registration, were consolidated into Haussler. So by the time of the turnover in that case that came up to the Second Circuit, both judgments were consolidated in that single enforcement proceeding. The arguments about lack of subject matter jurisdiction, both with respect to the state court judgment and the federal judgment, were squarely presented on that appeal. Your honors may remember, there were two of you on that panel, that there was time set to argue subject matter jurisdiction. There were 16 minutes that were given to counsel to address that very issue. At the same time that that was happening, there was a collateral attack that had taken place in the Southern District of Florida, by BVVA and the other adverse claimants in Haussler, where they attacked subject matter jurisdiction. That was fully litigated there. That's the case where the government came in with the statement of interest to state one reason why the designation of Cuba as a terrorist state occurred. We submitted in that case that was not the only reason, and that that statement of interest was inconclusive. Notwithstanding all that, the Southern District of Florida judge ultimately concluded to keep his judgment intact, because full faith and credit had already been given to that judgment in New York. Judge Marrero had confirmed to him that he had given full faith and credit to the state court judgment. And therefore, BBVA lacked standing. Lacked standing. That's his opinion, to collaterally attack this judgment. When was that decision that you're describing? That decision, I can give you the date. It's in the record. But I have it here. September 13, September 2013, 11th September, 2013. Roughly five years ago. That's right. It was five years ago. The Haussler judgment, by the way, has been enforced ten times. And there have been turnover orders and monies paid over with respect to that judgment. How is this case different from all other judgments? It's no different, except this case has the Haussler merits ruling that it has to address. And so there were two phases set up in this case. One was EFTs, electronic funds transfers, that could still be turned over because the originator or the bank was a Cuban entity. The others were phase two, which is a result of the Haussler ruling could not be reached. The court ruling that New York law says there's no property interest in an electronic funds transfer in the hands of an intermediary. So what you have is you have the Southern District of Florida judgment, full faith and credit judgment, intact. You have the Haussler ruling exercising subject matter jurisdiction to reach the merits, okay? And you have now this case, which is, again, was a follow-on to Haussler. We intervened. There were other creditors that came into New York to try to collect, and we were competing with them. And Judge Hellerstein said you should cooperate instead of fight with each other, which led to this posture. Why can't you all get along? Yeah. So what is going on here? Why is this thing going on? Do you have a theory? I'm asking you to, of course, describe, impute motivation or strategic components, but I'm having a little difficulty getting my arms around the case, which has gone on so long and manages to come up like a bad penny constantly. Right. Well, I agree with you, Judge. There should be an end to litigation. Obviously, our view would be when the judgment is satisfied. Our understanding is there's, you know, we've gone through the electronic funds transfer dispute, and in the Southern District of New York, at least, we understand there are too many other collectible assets outside of those electronic funds transfers, which are not collectible as a result of Haussler. So, you know, as all the case law says and the cases we've cited, there's got to be some end to litigation, and this has gone on far too long. All right. We'll hear from Mr. Ball. May it please the Court, I don't intend to take all five minutes because I believe a lot of the issues have already been addressed. But I think that the last question is an important question because I think there is an effort to preempt the discussion on jurisdiction by saying, because there was an issue related to an independent contempt citation proceeding, which addressed subject matter jurisdiction, we should suddenly now not look at what Judge Hellerstein found was supporting the jurisdictional findings, nor give him another chance to look at it, but rather simply say, well, Vera didn't have jurisdiction because two of the deaths, Robert Fuller's death and Gustavo Villalobos Sr.'s death occurred in 1959. That is the end of it. The difference between the cases is that there was record evidence offered and found by the trial judges that these were events that ultimately were recognized and became part of the events that led to the designation of Cuba as a state sponsor of terrorism in 1982. So the record differs as to each of those individuals and what contribution the death had to the designation, the ultimate designation of Cuba. Is that right? That's correct. So what happened was, this would have been a garden variety, we're too early, and we should go back and get the final judgment, except it, with all due respect to Mr. Caruso, it was his effort to try to get this Vera and Premature prematurely and without fairly dealing with the record, so that maybe he gets that advantage. Going to your question, Your Honor, when this case came before the court, I understood irreparable injury, and I still understand irreparable injury. Irreparable injury is not the economic, there are two risks that are not within the ambit of irreparable injury. First, in the turnover order, there was exculpatory language that said that this bank, BBVA, could not be sued by, consistent with the House of Ruling, the entity that provided the money or anybody else over the turnover of that money. Then they say, well, we could find ourselves exposed in Argentina or someplace else to a lawsuit that doesn't recognize that order. And the court said that's an inherent risk of doing business in international law. So that's speculative. It's inviting a speculation. The second argument dealing with the same issue dealt with, and this is factually in the record, the correct procedure was to request a 54B certification. They did that. The judge said it didn't meet the standards for that certification and denied the motion. Then they asked for a final judgment, but only asked to them rather than the entire proceeding. And the judge said, I'm not doing that either. Now, if the court does what I think it should do, which is simply say this appeal is premature, it goes down to Judge Hellerstein. The jurisdictional findings are there and in the record. If they still insist on bringing it back up, it comes up in a proper way for you to see it and dispose of it, and it's probably going to be one of the shortest proceedings ever, and it's over. But we find ourselves, I think I counted, there were seven different visits to the appellate court by BBVA. Very energetic, all in a way to try to avoid this matrix, which is designed to prevent these separate turnovers from jumping up all the time. So you would have us remand with direction to Judge Hellerstein to enter an order in this case? To enter? No. I'd have you remand because in reality, a remand to conclude the case will ultimately bring it all to a head. He'll get your final judgment. He'll make his jurisdictional findings again if he needs to, and it will come back up in a proper way, and we're done. That's what I would have you do. Thank you. We'll hear from Mr. Caruso. What's wrong with that, Mr. Caruso? You seem to want us to ask judgment from Judge Hellerstein. With respect to a remand, first, I must disagree with Mr. Perkins that the Vera case enters a remand with respect to Villaldo or Hausler. What Vera says is the district court's order was reversed with costs, and the case is remanded with instructions to grant BBVA's motion to quash the subpoena. It's got nothing to do with the Perkins case or the Hall case. So that's a complete red herring. With respect to the other possible remand— We can leave that open to Judge Hellerstein to figure out what the scope of his judgment ought to be, right? Well, this goes to my—yes, you could. This goes to my second point. Footnote 8 of Vera says we're not going to remand Vera. We're going to decide the merits, even though Judge Hellerstein did not decide the merits, because the case prevents no relevant, unanswered, factual questions regarding the existence of subject matter jurisdiction, and it's therefore unnecessary to remand. The same can be said of these two cases. But that matter has been decided by the court of appeals. Yes, but the Valado case and the Haussler case can similarly be decided by this court on this appeal without a remand, because there are no unanswered, factual questions going to jurisdiction. Put differently or simply, a remand is unnecessary. The facts are in the record. They present a pure question of law. You have jurisdiction, I believe, and I ask you to decide those issues. Mr. Cruso, let me just ask a side question here. We received this morning a notice of supplemental authority regarding a final decision in the Florida case, the amended final judgment. Yes. And I wonder if you could just comment on that. I noticed that you were listed as receiving a copy. Are you counsel in that case? I don't know why I'm on that list. I have nothing to do with that case. I've never appeared. My client's not a party. I believe that's Mr. Hall trying to somehow put me on notice. Okay. So please, disregard that. I'm not sure how the judge made me an interloper there. Yeah, let me comment on that, because it's quite extraordinary that the night before the oral argument, they come up with an amended judgment from the judge. And I'm going to suggest to you that it is a perfectly obvious effort to tailor the record to try to meet this Court's decision in VERA. For example, you look at page 9. The judge down there was very accommodating, wasn't she? She said that these assets that were taken from the Velaldos were used to fund the FARC and the ALM, which used terrorism as a policy instrument. That's a quote from VERA. I mean, this is an attempt to tailor the record after the fact to your decision, and I think that it shouldn't be tolerated. I'm puzzled by that. You said this is all a question of law, and I've been puzzled throughout as to the status of the question, did any of these events affecting these people enter into the determination to put Cuba on the sponsor of terrorism list? Is that a legal question or a factual question? I believe that that is a legal question, and this Court made a holding that the record suggests the State Department designated Cuba as a state sponsor of terrorism, generally because of its support for revolutionary violence and groups that use terrorism as a policy instrument. That's a holding, and that's based on the testimony of the State Department officials both in 1982 when it was designated and in 2012 when a declaration was put in in a related case. What exactly is the relevance of all of that, of that statement of interest? It shows that Cuba was not designated, quote, as a result of any of these killings. And what conclusion do we draw? And, therefore, the terrorism exception does not apply, and, therefore, there's no subject matter jurisdiction, and, therefore, the judgments are all void. But you see, when I say the Court did enter that holding, but it did so, as you read, saying the record suggests. In other words, it's basing that determination on factual testimony about what actually happened. Yes, and the record here is no different, because there's absolutely no evidence in the record that links the designation to these extrajudicial killings. Any more than to Mr. Vera's situation. Indistinguishable from Vera. Indistinguishable. And that's why I think it presents a question of law. And if Your Honor is concerned about prolonging the litigation, please decide the merits here rather than remand so that we can have lawyers come in and say, no, no, really, I got new facts, you know, and new judgments from Florida. Very accommodating. So if you want to end this, I think you clearly have the power and you have the Vera precedent on which you can end this, and I certainly hope you do. Let me just consider my notes, and then I want to address Judge Cabranes' point about what's really going on here. Excuse me. Can I ask just one more thing about the Villaldos? Of course, you can ask as many as you want. Yeah. Well, you know, I'm sensitive to you. You have something you want to say, and we're using up your time on other things. But Mr. — I can only tell the young lawyers about oral argument. You pointed out correctly that there are four separate matters here, the Villaldo Jr. case, which takes place after Cuba is designated as a terrorist sponsor. And the argument there is not that this didn't have anything to do with the designation, because that doesn't matter. The argument there is this was not a torture. Okay. Precisely. Is that not a question that, distinguished from the other three cases, goes . . . Is that a distinguishable case from the other three? It's distinguishable in that sense, but Your Honors can still decide it as a matter of law, because on the facts alleged, there's no torture. This is not torture because this was an arguable assassination attempt that didn't happen. Well, there's no custody. There's no custody. No custody. Right, right. Mr. Villaldo wasn't even at home. Now, how somebody can be tortured when he's not even at home is beyond me. But even looking at the non . . . I can't imagine a number of ways. But the Mrs. Villaldo . . . Shoot up the household. Okay. That could be . . . Fine. The allegations are that these four people came around the house. They never entered the house. They dispersed within minutes when Villaldo's wife ran out the front door with an AR-15 rifle. Villaldo's son ran into the backyard with the second AR-15 rifle, and the wife was screaming, I'll shoot anyone who tries to come closer. Now, how can those people be in custody when they're brandishing a firearm, ready to shoot the would-be torturer, and they're not simultaneously in the hands of or in the custody of those people? As a matter of law, Judge Lynch, that can be decided. In this court, there's no torture. Okay. You could remand it, but then you'll just be prolonging what is a question of law. Now, I may be wearing out my welcome, but just give me one moment. Right. I want to make one other point, and then very briefly, and then talk about what's going on here. Mr. Perkins has argued that this Court's 2014 decision in Haussler is collateral estoppel against me here. Judge Lynch and Judge Carney sat on that panel. The opinion was written by Judge Hall. I suppose it's a bit presumptuous for any lawyer to tell you what you decided and how you decided it, but let me just make a few points as to why that's not collateral estoppel here. First of all, we had no right to appeal. We won. BBVA won all the relief that it sought, so how could it appeal from some supposed threshold jurisdictional issue? Their position goes to the absurd length of saying, even though we won everything we want, we should have filed a cert petition on the threshold jurisdictional question. It's not realistic, and collateral estoppel does have a certain amount of discretion and realism there. Second, Haussler was a perfect candidate for the exercise of hypothetical jurisdiction. The result was foreordained by the companion case of Calderon. It was argued simultaneously. We had an army of lawyers up here. You heard two appeals at once, and then Calderon was decided, deciding the UCC property point, and then two days later, my case was decided, procuring them. So I think it's a good example of hypothetical jurisdiction. And finally, VERA has changed the legal landscape. Even if there would otherwise be an estoppel, when the legal landscape changes, and VERA did change the legal landscape, saying you have to make an independent determination, a district judge has to make an independent determination of the record, then you can have a re-litigation. I won't belabor the point. I'll ask one last question about the double liability issue. Yes. If this were a case of a plaintiff being given money from a defendant, that would be one thing. But how do you suffer irreparable injury, your client, as a stakeholder, in a situation where the court has entered a protective order saying you are not going to be liable to Cuba for whatever happens here? How do you get irreparable injury? The discharge order is unenforceable because the district court had no personal jurisdiction over the Cuban originator. If we give this money over to these plaintiffs, as we have, those accounts are unblocked now by order of the Obama administration. That Cuban originator can come to us and say, we'd like our money now, and we'd have to pay that over. As a defense, I put up the Hellerstein discharge order, and that Cuban company says, I'm not bound by that. Who says they're not bound by that? Well, how can they be? They did nothing in the Southern District of New York, and nobody ever made them a party. So, you know, I don't think there's any personal jurisdiction over the Cuban originator that would come knocking on our door, and therefore the discharge order doesn't protect us. You have this enormous concern, which has triggered so much energy, admirable energy, because of the possibility that the Cuban government is going to come after the Banco Vizcaya, Vizbao Vizcaya? That's just the last of it. Let me go into this now. What's going on here? It is incorrect to describe BBVA as a mere stakeholder. When this case started against my client back in 2011, the Haussler plaintiffs were seeking to execute on certain electronic funds transfers that were blocked. My client owned those. My client was not a stakeholder. My client had a property interest in those accounts. So we were litigating our own property, and Judge Marrero refused to address these challenges, which the Vera case now says he should have done, and sent us to the Southern District of Florida, thereby creating another wave of litigation. So, of course, we went down there. So this started and went on for years as a dispute in which BBVA was seeking to recover its own property. We won. That's the Haussler decision at 770 F3rd. And those accounts were later unblocked, and my client got that money. So we were litigating over our property. Then you have what became the Vera case in this court, which was a subpoena by the other plaintiff, Mr. Vera, for worldwide discovery. Now, the other banks didn't really have much at stake there because banks in England and banks in Switzerland, they don't do a lot of business with Cuba. But my client's a Spanish bank, and we do a lot of business with Cuba. As a matter of fact, it's a public record. We have a representative office in Havana, and we do a lot of business in South America and Central America. So we wanted to protect our records with respect to the worldwide dealings that we had with Cuban entities. I believe that was an entirely legitimate exercise, and we had a stake in that that no other litigant in these cases had. And that takes us right up until last year, 10 months ago. So meanwhile, we've been litigating these remaining issues because we had to maintain a consistent position in all of these cases. There's no subject matter jurisdiction. We couldn't just cave in because we've been litigating all these other issues. I tried to dismiss. Mr. Perkins mentioned that the Southern District of Florida refused to adjudicate my challenge, saying that we lacked standing. We appealed that to the Eleventh Circuit. That case has stayed pending this case. I tried to get that dismissed. I said, this is moot. The challenge is moot because we already won our money. We started that before the 2014 Haussler decision was entered. Once we won all that money, I had no further reason to litigate in the Southern District of Florida. They refused. They refused. So, you know, what's going on here is ask them why they think that case is still alive. I'm litigating there because they forced me. So we had a stake in this, a very legitimate stake. It was our property. We had a genuine interest in not giving worldwide dispute. Was it your property originally? My client had about $8.5 million, and I was litigating on behalf of a bank group, which had about $17 million at stake. So, you know, it's legitimate. Anyway, that's what's going on. Thank you very much. Thank you for your time. Yes. He raised two issues on his rebuttal. Go ahead. No, yes. These are serious issues, and I'll go ahead. And I first want to address the issue about the Eleventh Circuit appeal. Two minutes. Okay. The Eleventh Circuit appeal, the reason there's no voluntary dismissal is because the rule in the Eleventh Circuit is if an appeal is dismissed, the underlying judgment is vacated. That's very important to us because we have a ruling from the Southern District of Florida, again, that his client does not have standing to collaterally attack our judgment because the Southern District of Florida judgment was registered in this court and because Judge Hellerstein in the Haussler case granted full faith and credit to the state court judgment. It's very important to us. The issue of hypothetical jurisdiction, which is raised on reply, there's no hypothetical jurisdiction here. Your Honors will remember that the Calderon-Cardona case was decided under 1610G, which does not apply to Haussler. Haussler has a 1605A7 judgment, and so the only ability for it to execute was under TRIA. So Calderon-Cardona said TRIA does not apply because North Korea was not designated a terrorist state at the time the judgment was entered. Then it turned to 1610G and said you cannot execute. There's no property right under the statutes that allows you to execute on electronic funds transfers. Haussler was under TRIA itself. And so the court wrote this is a case of first impression under TRIA, and the ruling there was that TRIA has no property right within that statute and in the Cuban asset control regulations that were at issue in that case that would grant the property right to preempt state law and therefore state law applied. No hypothetical jurisdiction, two different cases. Thank you very much. We'll reserve the decision. We're adjourned. Thank you.